Lance Erickson
Manning & Meyers, Attorneys at Law
4340 North Central Expressway
Dallas, Texas 75206
(214) 823-6600  fax (214) 821-3800
Lance@lawyeranddefender.com
Attorney for Stone Meadow (Fort Worth) Homeowners' Association,
Inc. a/k/a Stone Meadow Subdivision

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| IN RE: | § | <u>CAUSE NO. 15-43524</u> |
| **Linda Ish,** | § | |
| | § | |
| **Debtor.** | § | **CHAPTER 13** |

## <u>AMENDED MOTION FOR RELIEF FROM AUTOMATIC STAY AGAINST LINDA ISH,</u>
## <u>WAIVER OF 30-DAY HEARING REQUIREMENT, AND REQUEST FOR HEARING</u>

TO: THE HONORABLE JUDGE OF THE UNITED STATES BANKRUPTCY COURT

## <u>NOTICE OF LOCAL RULE 4001(b)</u>

**PERSUANT TO LOCAL BANKRUPTCY RULE 4001-1(A), A RESPONSE IS REQUIRED TO THIS MOTION, OR THE ALLEGATIONS IN THE MOTION MAY BE DEEMED ADMITTED, AND AN ORDER GRANTING THE RELIEF SOUGHT MAY BE ENTERED BY DEFAULT.**

**NO HEARING WILL BE CONDUCTED ON THIS MOTION UNLESS A WRITTEN OBJECTION IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AND SERVED UPON THE PARTY FILING THIS PLEADING WITHIN FOURTEEN (14) DAYS FROM THE DATE OF SERVICE UNLESS THE COURT SHORTENS OR EXTENDS THE TIME FOR FILING SUCH OBJECTION.  IF NO OBJECTION IS TIMELY SERVED AND FILED, THIS PLEADING SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER GRANTING THE RELIEF SOUGHT.  IF AN OBJECTION IS FILED AND SERVED IN A TIMELY MANNER, THE COURT WILL THEREAFTER SET A HEARING.  IF YOU FAIL TO APPEAR AT THE HEARING, YOUR OBJECTION MAY BE STRICKEN.  THE COURT RESERVES THE RIGHT TO SET A HEARING ON ANY MANNER.**

COMES NOW, Stone Meadow (Fort Worth) Homeowners' Association, Inc. a/k/a Stone Meadow

Subdivision, the "Movant," a secured creditor in the above-entitled and numbered case, and files this, their Motion

To Lift Automatic Stay pursuant to Section 362 of the Bankruptcy Code and in support thereof would respectfully

show the Court the following:

## I. JURISDICTION

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334.

2.    The matters raised in this Motion constitute core proceedings within the meaning of 28 U.S.C. §157(b)(2)(G).

3.    Venue of these proceedings is proper in this Court pursuant to 28 U.S.C. § 1409.

## II. FACTS

4.    Linda Ish filed a voluntary Chapter 13 case on September 1, 2015.

5.    Linda Ish is the record title holder to the real property, with all improvements thereon, located at 4724 Pine Ridge Lane, Fort Worth, Texas 76123, and is thus a member of Stone Meadow (Fort Worth) Homeowners' Association, Inc. a/k/a Stone Meadow Subdivision.  Said property is more particularly described as follows:

> Lot 2, in Block U, of Stone Meadow Addition, an addition to the City of Fort Worth, Tarrant County, Texas, according to the Plat thereof recorded in Cabinet A, Slide 7509 and 7510, of the Plat Records of Tarrant County, Texas; and

> Also known as:

> 4724 Pine Ridge Lane, Fort Worth, Texas 76123 (hereinafter "the Property")

6.    The Property is burdened by, among other things, the Declaration of Covenants, Conditions and Restrictions for Stone Meadow (Fort Worth) Homeowners' Association, Inc. a/k/a Stone Meadow Subdivision, executed by Legacy/Monterey Homes, L.P., an Arizona limited partnership, as Declarant, and recorded on or about December 18, 2000, at Instrument Number D200280034 in the Real Property Records of Tarrant County, Texas, including any amendment thereof and supplements thereto and entitled "Declaration of Covenants, Conditions, and Restrictions for Stone Meadow Subdivision" (hereinafter "Declaration").

Linda Ish, by accepting a deed to the property, whether or not it was so expressed in such deed or other conveyance, is deemed to covenant and agree to pay to Stone Meadow (Fort Worth) Homeowners' Association, Inc. a/k/a Stone Meadow Subdivision certain assessments together with late fees, interest, costs and reasonable attorney's fees.  These assessments are levied by the Association and are used, in part, to provide for normal recurring maintenance charges for the Common Properties, as well as improvements to the Common Properties,

which are for the use and benefit of all members of the Association as well as other expenses determined by Stone Meadow Subdivision Board of Directors to benefit the Association as a whole.

The assessments and certain charges are also secured by a Lien in favor of the Association against each property.  The power to charge assessments is set forth in Article IV, Section 4.1 and 4.3 of the Declaration which states in pertinent part as follows:

> Section 4.1:  "*Creation of the Lien and Personal Obligation of Assessments. Subject to the terms hereof, each Owner of any Lot by acceptance of a deed therefor, whether or not it shall be expressed in any such deed or other conveyance, covenants and agrees to pay to the Association: (i) regular assessments or charges, (ii) charges in connection with the transfer of a Lot, and (iii) special assessments (collectively, the "Assessments"). Such Assessments are to be fixed, established, and collected as provided herein. Assessments, together with such interest thereon, costs of collection thereof, and costs of enforcement of this Declaration, as hereinafter provided, shall be a charge on the Lot and shall be secured by a continuing lien which is hereby created and impressed for the benefit of the Association upon the Lot against which each such Assessment is made. Each such Assessment, together with such interest costs and reasonable attorney's fees for the collection thereof, shall also constitute a personal obligation of the person or entity who was the record Owner of such Lot at the time of the Assessment. The personal obligation for delinquent Assessments shall not pass to successors in title unless expressly assumed by such successors; however, the lien upon the Lot shall continue until paid.*"

> Section 4.3: "*Basis and Maximum of Regular Assessments and Transfer Fees on the Sale of Lots.*
> a.  *The initial regular Assessment shall be an amount determined by the Board of Directors not to exceed Forty and No/100 Dollars ($40.0) per month or Four Hundred Eighty and No/100 Dollars ($480.00) per annum for each lot.*
> b.  *From and after January 1 of the first full year after the date of recordation of this Declaration and each year thereafter, the maximum regular assessment may be increased by the Board of Directors by an amount up to ten percent (10%) over the preceding year's regular assessment. Any increase over and above ten percent (10%) of the previous year's regular assessment shall be done only by the prior approval of sixty-six and two-thirds percent (66-2/3%) of the outstanding votes of each class of Members entitled to vote (determined pursuant to Section 3.2 hereof) present at a meeting at which a quorum is present.*"

A copy of said Declaration is attached to this Motion as "Exhibit A" and incorporated by reference.

7.   The Debtor is in default on their obligation to Movant in that Debtor has failed to make their Post Bankruptcy Assessment payments when due and owing pursuant to the terms of the above described declaration.

8.   Debtors were in default in the amount of $15,144.49 at the time of the bankruptcy filing.

9.   Debtor has failed to make Post Bankruptcy Assessment payments.  Debtor owes $848.00 in Post-Bankruptcy Assessment Payments as of the time of the filing of this motion.  This amount does not include any

other charges incurred on behalf of Movant in relation to this bankruptcy action or in relation to fines, fees, and charges in relation to the Debtor's account.

10. Article IV, Section 4.8(b) and Section 4.8(d) of the Declaration provides that in the event of non-payment by any Owner of any assessments or allowed charge, the Movant may enforce non-payment by the foreclosure of the Debtor's Property or institute suit against the Debtor as they are personally obligated to pay the assessment. Article IV, Section 4.8(b) and Section 4.8(d) of the Declaration, states in pertinent part as follows:

"Section 4.8: _Effect of Non-Payment of Assessments; Remedies of the Association._

b. Any Assessment provided for in this Declaration which is not paid when due shall be delinquent. If any such Assessment is not paid within thirty (30) days after the date of delinquency, the Assessment shall bear interest from the date of delinquency (with no notice required to be given), until paid, at the rate of eighteen percent (18%) per annum or the maximum rate allowed by law, whichever is the lesser. The Association may, at its option, bring an action at law against the Owner personally obligated to pay the same, or upon compliance with the notice provisions hereof, foreclose the lien against the Lot as provided in Subsection 4.8(d) hereof. If any Owner is delinquent in paying its Assessments more than once in any twelve (12) month period, then in addition to the other rights and powers granted herein, the Board of Directors may impose a fine not to exceed $500.00 for each such delinquent payment. Shall be added to and included in the amount of such Assessment any and all expenses or costs incurred by the Association in collecting any delinquent Assessment and foreclosing such lien, including said interest, fines, and reasonable attorneys' fees. Each Owner vests in the Association or its assigns, the right and power to bring all actions at law or in equity foreclosing such lien against such Owner. Under no circumstances, however, shall Declarant or the Association be liable to any Owner or to any other person or entity for failure or inability to enforce any Assessments.

d. Any such sale provided for above is to be conducted in accordance with the provisions applicable to the exercise of powers of sale in mortgages and deeds of trust, as set forth in Section 51.002 of the Property Code of the State of Texas (as it may be amended from time to time), or in any other manner permitted by law. Each Owner, by accepting a deed to a Lot, expressly grants the Association a power of sale as set forth in said Section 51.002 of the Property Code, in connection with the Assessment lien. The Association, through duly authorized agents, shall have the power to bid on the Lot at foreclosure sale and to acquire and hold, lease, mortgage, and convey the same."

11. By failing to make the regular Post-Petition assessment payments pursuant to the Declaration, Debtors have not provided adequate protection to Movant. The plan provides that the Debtor shall make adequate protection in the form of ongoing monthly payments paid directly to Movant. Debtor's delinquency indicates either a willful non-compliance with the plan or an inability to meet the terms of the plan. As such, causes exist for the lifting of the stay.

12. Movant has no remedy available to it other than to seek relief from the automatic stay.

13. Movant specifically requests permission from this Honorable Court to communicate with Debtors and Debtor's counsel to the extent necessary to comply with applicable non-bankruptcy law.

14. Movant has had to retain counsel to represent it before this Court and is incurring legal expenses and attorney's fees for which it is entitled and to reimbursement under the terms of the Declaration.

### III. RELIEF REQUESTED

15. Movant request that the Court lift the stay for cause and for lack of adequate protection pursuant to 11 U.S.C. § 362(d)(1) in order to allow them to proceed to foreclose their lien against the Property.

16. Alternatively, Movant requests that the Court lift the stay pursuant to 11 U.S.C. §362(d)(2) because the Property is not needed for an effective reorganization.

17. Movant requests that they be granted reasonable attorneys' fees in the amount of $700.00 for filing and prosecuting this Motion.

18. Movant requests that the provision of Fed. R. Bankr. P. 4001(a)(3) be waived and that Movant be permitted to immediately enforce and implement any order lifting the automatic stay.

### IV. PRAYER

WHEREFORE PREMISES CONSIDERED, Movant prays for an order lifting the automatic stay to permit Movant to foreclose and gain possession of the Real Property and for such other relief to which the Movant may be justly entitled.

RESPECTFULLY SUBMITTED,

_____/s/Lance Erickson_____
LANCE ERICKSON
Texas Bar No. 24072509
4340 N. Central Expressway, Suite 200
Dallas, Texas 75206
Telephone: (214) 823-6600
Facsimile: (214) 821-3800
Email: Lance@lawyeranddefender.com
Attorney for Stone Meadow (Fort Worth) Homeowners' Association, Inc. a/k/a Stone Meadow Subdivision

**MOTION FOR RELIEF FROM AUTOMATIC STAY**
**DEBTOR- LINDA ISH**
**CREDITOR- STONE MEADOW (FORT WORTH) HOMEOWNERS ASSOCIATION, INC. A/K/A STONE MEADOW SUBDIVISION**

**Page 5**

**CERTIFICATE OF CONFERENCE**

I hereby certify that on April 13, 2016, our office called the offices of Alice Bower, attorney for the Debtor regarding this motion. Debtor's attorney stated that they were opposed to the filing of this motion.

/s/ Lance Erickson
Lance Erickson, Attorney for Movant

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing Motion of Stone Meadow (Fort Worth) Homeowners' Association, Inc. a/k/a Stone Meadow Subdivision to Lift Stay was served via electronic means this 11th day of May, 2016, upon the following:

/s/ Lance Erickson
Lance Erickson, Attorney for Movant

| | | |
|---|---|---|
| **Bravo Servicing Solutions, Inc. servicer for Genesis Tax Solutions, Inc.** 25003 Pitkin Rd. #C100 Spring 888-292-2167 *Added: 09/09/2015* *(Creditor)* | represented by | **M. Suzanne Frossard** M. Suzanne Frossard, P.C. 3709 S. University Drive Fort Worth, TX 76109 817-924-3211 817-926-5312 (fax) sfrossard@frossardlaw.com *Assigned: 09/09/15* |
| **Carrington Mortgage Services, LLC** *Added: 03/23/2016* *(Creditor)* | represented by | **Max M. Murphy** Angel L Reyes & Associates, PC 5950 Berkshire Lane, Ste. 410 Dallas, TX 75225 (214) 526-7900 (214) 526-7910 (fax) bankruptcy@reyeslaw.com *Assigned: 03/23/16* |
| **Crowley ISD** % Perdue Brandon Fielder Et Al 500 E. Border Street Suite 640 Arlington, TX 76010 817-461-3344 817-860-6509 (fax) *Added: 09/18/2015* *(Creditor)* | represented by | **Eboney D. Cobb** Perdue Brandon Fielder Collins & Mott 500 E. Border St, Suite 640 Arlington, TX 76010 (817) 461-3344 (817) 860-6509 (fax) ecobb@pbfcm.com *Assigned: 09/18/15* |

**MOTION FOR RELIEF FROM AUTOMATIC STAY**
**DEBTOR- LINDA ISH**
**CREDITOR- STONE MEADOW (FORT WORTH) HOMEOWNERS ASSOCIATION, INC. A/K/A STONE MEADOW SUBDIVISION**

Page 6

| | | |
|---|---|---|
| **Linda Ish**<br>4724 Pine Ridge Lane<br>Fort Worth, TX 76123<br>SSN / ITIN: xxx-xx-7186<br>*Added: 09/01/2015*<br>*(Debtor)* | represented<br>by | **Alice Bower**<br>Law Office of Alice Bower<br>6421 Camp Bowie Blvd<br>Suite 300<br>Fort Worth, TX 76116<br>(817) 737-5436<br>(817) 737-2970 (fax)<br>bknotice@alicebower.com<br>*Assigned: 09/01/15*<br>*LEAD ATTORNEY* |
| **JPMorgan Chase Bank, National Association**<br>c/o BDFTE, LLP<br>15000 Surveyor Blvd Suite 100<br>Addison, TX 75001<br>*Added: 09/15/2015*<br>*(Creditor)* | represented<br>by | **Steve Turner**<br>Barrett Daffin Frappier Turner & Engel<br>610 West 5th Street, Suite 602<br>Austin, TX 78701<br>512-477-0008<br>512-477-1112 (fax)<br>ndecf@BDFGROUP.com<br>*Assigned: 09/15/15* |
| **Poynter Crossing Homeowners Association**<br>c/o CMA<br>1800 Preston Park Blvd., Ste. 101,<br>Plano, TX 75093<br>*Added: 12/02/2015*<br>*(Creditor)* | represented<br>by | **Judd A. Austin, Jr.**<br>Henry, Oddo, Austin & Fletcher, PC<br>1700 Pacific Avenue<br>Suite 2700<br>Dallas, TX 75201<br>(214) 658-1900<br>(214) 658-1919 (fax)<br>jaamex@hoaf.com<br>*Assigned: 12/02/15* |
| **Stone Meadow (Fort Worth) Homeowners' Association, Inc.**<br>Manning & Meyers<br>4340 North Central Expressway<br>Suite 200<br>Dallas, TX 75206<br>U.S.A.<br>214-823-6600<br>214-821-3800 (fax)<br>casey@lawyeranddefender.com<br>*Added: 09/09/2015*<br>*(Creditor)* | represented<br>by | **Jack Warren Manning**<br>The Manning Law Firm<br>4340 N. Central Expwy., Ste. 200<br>Dallas, TX 75206<br>(214) 823-6600<br>(214) 821-3800 (fax)<br>jack@lawyeranddefender.com<br>*Assigned: 09/09/15* |
| **Tarrant County**<br>Linebarger Goggan Blair & Sampson<br>co Melissa L. Palo<br>2777 N. Stemmons Freeway<br>Suite 1000<br>Dallas, TX 75207<br>214-880-0089<br>469-221-5003 (fax)<br>dallas.bankruptcy@lgbs.com<br>*Added: 09/18/2015*<br>*(Creditor)* | represented<br>by | **Melissa Linell Palo**<br>Linebarger Goggan Blair & Sampson, LLP<br>2777 N. Stemmons Frwy Ste 1000<br>Dallas, TX 75207<br>(214) 880-0089<br>(469) 221-5003 (fax)<br>melissa.palo@lgbs.com<br>*Assigned: 09/18/15* |

**MOTION FOR RELIEF FROM AUTOMATIC STAY**
**DEBTOR- LINDA ISH**
**CREDITOR- STONE MEADOW (FORT WORTH) HOMEOWNERS ASSOCIATION, INC. A/K/A STONE MEADOW SUBDIVISION**

**Tim Truman**
6851 N.E. Loop 820, Suite 300
N Richland Hills, TX 76180
817-770-8500
ftworthchapter13trustee-ecf@ch13ftw.com
*Added: 09/01/2015*
*(Trustee)*

**United States Trustee**
1100 Commerce Street
Room 976
Dallas, TX 75242
214-767-8967
ustpregion06.da.ecf@usdoj.gov
*Added: 09/01/2015*
*(U.S. Trustee)*

**MOTION FOR RELIEF FROM AUTOMATIC STAY**
**DEBTOR- LINDA ISH**
**CREDITOR- STONE MEADOW (FORT WORTH) HOMEOWNERS ASSOCIATION, INC. A/K/A STONE MEADOW SUBDIVISION**

Page 8

AFTER RECORDING, RETURN TO:

Legacy Homes
4050 West Park Blvd.
Plano, Texas 75093-3839

# DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS

## FOR

## STONE MEADOW SUBDIVISION

| | |
|---|---|
| STATE OF TEXAS § | |
| COUNTY OF TARRANT § | **KNOW ALL MEN BY THESE PRESENTS:** |

   **THIS DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS FOR STONE MEADOW SUBDIVISION** (this "Declaration"), is made on the date hereinafter set forth by **LEGACY/MONTEREY HOMES, L.P.**, an Arizona limited partnership, for the purpose of evidencing the covenants, conditions and restrictions contained herein.

## W I T N E S S E T H:

   **WHEREAS**, Declarant is the owner of that certain real property platted as Stone Meadow Addition, as approved by the City of Port Worth and filed of record on September 8, 2000 in Cabinet A, Slide 6106 of the Plat Records of Tarrant County, Texas, said subdivision hereinafter referred to as the "Development", and such plat, as may be amended or further replatted, being referred to as the "Plat", all of said real property, hereinafter referred to as the "Property", being more specifically described on the Plat of the Development which is incorporated herein and made a part hereof for all purposes.

   **NOW, THEREFORE**, Declarant hereby declares that all of the Property shall be held, sold and conveyed subject to the following easements, restrictions, covenants and conditions, all of which are for the purpose of enhancing and protecting the value, desirability and attractiveness of the Property. These easements, covenants, restrictions and conditions shall run with the Property and be binding on all parties having or acquiring any right, title or interest in the Property or any part thereof, their heirs, successors and assigns, and shall inure to the benefit of Declarant and each owner thereof.

## ARTICLE I

## ADDITIONAL DEFINITIONS

   **1.1   Association.**  "Association" shall mean and refer to Stone Meadow (Fort Worth) Homeowners' Association, Inc., its successors and assigns.

   **1.2   Areas of Common Responsibility.**  "Areas of Common Responsibility" shall mean those areas listed below which the Association shall maintain, upkeep and repair:

   (a)   Any and all of the Common Area together with any and all now or hereafter existing improvements on, in or appurtenant to any Common Area such as temporary or permanent structures, recreational playing fields, and recreational amenities such as swimming pools, decks, patios, barbecues, picnic tables, etc.

(b)     Any and all landscaping, signage, monument signage, irrigation systems, lighting, fencing and other improvements located within any Common Area, and specifically including any and all entry way features, entry monuments, and perimeter screening walls circumscribing the Property in whole or in part, including the perimeter screening wall and entry feature located along South Hulen Street.

1.3     **Builder.** "Builder" shall mean Declarant and any homebuilder (which for purposes hereof shall be defined as any entity or person regularly engaged in the business of constructing single-family residences for the purpose of sale to third parties) owning Lots in the Development.

1.4     **Common Area.** "Common Area" shall mean those areas listed below:

(a)     Lot 1, Block F; Lot 1, Block C; Lot 40, Block A; and Lot 1, Block D as reflected on the Plat.

(b)     The Common Area Easement No. 1, Common Area Easement No. 2, Common Area Easement No. 3, Common Area Easement No. 4, all as defined in Section 7.1 below.

(c)     Any other portions of the Property as described or depicted on the Plat that do not constitute Lots, streets, roads or alleys.

**1.5     Declarant.** "Declarant" shall mean Legacy/Monterey Homes, L.P., an Arizona limited partnership, and any party to whom it shall expressly assign in writing, its rights, powers, privileges and prerogatives as the Declarant hereunder.

**1.6     City.** "City" shall mean the City of Fort Worth, Texas.

**1.7     County.** "County" shall mean Tarrant County, Texas.

**1.8     Home.** "Home" shall mean a single-family residential dwelling unit constructed on a Lot being a part of the Property, including the parking garage utilized in connection therewith and the Lot upon which the Home is located.

**1.9     Lienholder.** "Lienholder" or "Mortgagee" shall mean the holder of a first mortgage lien on any Home or Lot.

**1.10     Lot.** "Lot" or "Lots" shall mean and refer to the individual platted building lots depicted on the Plat of the Property, excluding open space, streets, alleys, and any Common Area or Areas of Common Responsibility. Where the context requires or indicates, the term Lot shall include the Home and all other improvements which are or will be constructed on the Lot.

**1.11     Member.** "Member" shall mean and refer to every person or entity who is a Class "A" Member or Class "B" Member of the Association as defined in Section 3.2 hereof. Declarant and each Owner shall be a Member in the Association.

**1.12     Owner.** "Owner" shall mean and refer to the record Owner, whether one or more persons or entities, of a fee simple title to any Lot and shall include Declarant and any Builder, but shall exclude those having such interest merely as security for the performance of an obligation. However, the term

*Declaration of Covenants, Conditions and Restrictions*
*(Stone Meadow)*

"Owner" shall include any Lienholder or Mortgagee who acquires fee simple title to any Lot which is a part of the Property, through deed in lieu of foreclosure or through judicial or nonjudicial foreclosure.

    **1.13**    **Vehicle.** "Vehicle" shall mean any vehicle or equipment or machinery of any kind or type whatsoever, including any automobile, truck, sport utility vehicle, motorcycle, boat, jet ski or any similar type marine craft, mobile home, motor home, aircraft, boat trailer or any other kind of trailer.

## ARTICLE II

## PROPERTY RIGHTS

    **2.1**    **Maintenance of Areas of Common Responsibility by the Association.** The Association will be solely obligated to maintain and improve the Areas of Common Responsibility in a prudent manner to enhance the safety, security and overall appearance of the Development. As such, the Association shall not, except as the Association may reasonably deem appropriate to comply with applicable laws or to protect the health, safety or welfare of the Development or the Members, (i) cause any buildings or permanent structures to be constructed within the Areas of Common Responsibility other than as contemplated in this Declaration that would materially interfere with the use or enjoyment of such areas by all of the Members, or (ii) allow any material interference or conflict with the natural or planted vegetation or trees in the Areas of Common Responsibility. The Association shall have the following rights with regard to the Areas of Common Responsibility:

    (i)    the right to dedicate or transfer all of any part of the Areas of Common Responsibility to any public agency or authority subject to such conditions as may be agreed to by the Members. No such dedication or transfer shall be effective unless (a) an instrument of agreement to such dedication or transfer, signed by the Association after receiving the approval of two-thirds (2/3) of the outstanding votes of each class of Members entitled to vote (determined pursuant to Section 3.2 hereof), is properly recorded in the Real Property Records of the County, (b) a written notice of proposed action under this Section is sent to every Owner (including Lienholder or Mortgagee) not less than thirty (30) days, nor more than sixty (60) days in advance of said action, and (c) the City consents in writing to the dedication or transfer;

    (ii)    the right to borrow money to be secured by a lien against the Areas of Common Responsibility; however, the rights under such improvement mortgage shall be subordinate and inferior to the rights of the Owners hereunder;

    (iii)    the right to make rules and regulations relating to the use of the Areas of Common Responsibility, including "fee-for-use" provisions or similar provisions for the use of any amenity center or recreation facility such as any swimming pool or recreational playing fields; and

    (iv)    the right to entry upon the Areas of Common Responsibility and any access, maintenance or other easements on the Property for the purposes of maintaining or improving the Areas of Common Responsibility.

    **2.2**    **Title to Areas of Common Responsibility.** After the recordation of this Declaration Declarant may, in Declarant's sole option, convey to the Association, without consideration, all right, title and interest of Declarant in and to the Areas of Common Responsibility owned by Declarant. Nothing contained herein shall create an obligation on the part of Declarant to establish any additional common areas or Areas of Common Responsibility.

## ARTICLE III

### ASSOCIATION MEMBERSHIP AND VOTING RIGHTS

**3.1** **Membership.** Declarant, during the time it owns any Lots, and each person or entity who is a record Owner of a fee or undivided fee interest in any Lot shall be a Member of the Association. The foregoing is not intended to include persons or entities who hold an interest merely as security for the performance of an obligation. Membership shall be appurtenant to and may not be separated from any ownership of any Lot which is subject to assessment by the Association. Transfer of ownership, either voluntarily or by operation of law, shall terminate such Owner's membership in the Association, and membership shall be vested in the transferee; provided, however, that no such transfer shall relieve or release such Owner from any personal obligation with respect to assessments which have accrued prior to such transfer.

**3.2** **Voting Rights.** The Association shall have two classes of voting membership.

(a) **Class "A".** The Class "A" Members shall be all Owners except Declarant so long as Declarant is a Class "B" Member pursuant to Section 3.2.(b) below. The Class "A" Members shall be entitled to one (1) vote for each Lot owned. When more than one person holds an interest in any Lot, all such persons shall be Members. The vote for such Lot shall be exercised as they among themselves determine, but in no event shall more than one (1) vote be cast with respect to any Lot.

(b) **Class "B".** The Class "B" Member shall be Declarant. Declarant shall be entitled to ten (10) votes for each Lot owned; provided however that Declarant shall cease to be a Class "B" Member and shall become a Class "A" Member entitled to one (1) vote per Lot on the happening of the earlier of the following events:

(i) when the total votes entitled to be cast of the Class "A" Members equals the total votes entitled to be cast of in the Class "B" Members, or

(ii) the expiration of ten (10) years from the recording date of this instrument in the Real Property Records of the County, or

(iii) when the Declarant, in its sole discretion, so determines.

Notwithstanding the foregoing, Class "B" membership shall be reinstated at any time before the expiration of twenty (20) years from the recording date of this instrument in the Real Property Records of the County if additional Lots owned by Declarant are added or annexed to the scheme of this Declaration in sufficient numbers to restore the ratio of Lots owned by Declarant to the number required for Class "B" membership pursuant to this Section 3.2.

**3.3** **No Cumulative Voting.** At all meetings of the Association, there shall be no cumulative voting. Prior to all meetings, the Board of Directors of the Association (the "Board of Directors", or the "Board") shall determine the total number of votes outstanding and entitled to vote by the Members.

**3.4** **Association's Powers.** In addition to the rights of the Association set forth in other sections of this Declaration, the Association shall have the duty to enforce the covenants, conditions and restrictions under this Declaration and maintain all Areas of Common Responsibility and shall have the right, power, and authority to do any act which is consistent with or required by the provisions of this

Declaration or the Bylaws of the Association (the "Bylaws"), whether the same be expressed or implied, including but not limited to the following:

    (a)    The power to levy and collect Assessments (as hereinafter defined), of whatever nature for the maintenance, repair or replacement of the Areas of Common Responsibility and for such other purposes as are herein provided;

    (b)    The power to keep accounting records with respect to the Association's activities ;

    (c)    The power to contract with and employ others for maintenance and repair; and

    (d)    The power to adopt rules and regulations concerning the operation of the Association including "fee-for-use" provisions or similar provisions for the use of any amenity center or recreation facility such as any swimming pool or recreational playing fields.

    **3.5**    **City's Rights.** Should Declarant, the Association or its Board fail or refuse to maintain such Areas of Common Responsibility to City specifications for an unreasonable time, not to exceed ninety (90) days after written request to do so, the City, by and through a majority of the City Council members, shall have the same right, power and authority as is herein given to the Association and its Board to enforce this Declaration and levy Assessments in the manner set forth herein. It is understood that in such event, the City may elect to exercise the rights and powers of the Association or its Board, to the extent necessary to take any action required and levy any Assessment that the Association might have, either in the name of the Association, or otherwise, to cover the cost of maintenance of such Areas of Common Responsibility.

    **3.6**    **Amenities.** Notwithstanding anything set forth in this Declaration to the contrary, the Association may in its discretion permit parties other than Owners or parties living in the Development to have access to and use and enjoy any amenity center or recreational facility constructed in the Common Area, such as any swimming pool or recreational playing fields, upon such terms and conditions reasonably established by the Association, including establishing a "fee-for-use" or similar charges.

## ARTICLE IV

### ASSESSMENTS MAINTENANCE FUND AND ASSESSMENT LIENS

    **4.1**    **Creation of the Lien and Personal Obligation of Assessments.** Subject to the terms hereof, each Owner of any Lot by acceptance of a deed therefor, whether or not it shall be expressed in any such deed or other conveyance, covenants and agrees to pay to the Association: (i) regular assessments or charges (ii) charges in connection with the transfer of a Lot, and (iii) special assessments (collectively, the "Assessments"). Such Assessments are to be fixed, established and collected as provided herein. Assessments, together with such interest thereon, costs of collection thereof, and costs of enforcement of this Declaration, as hereinafter provided, shall be a charge on the Lot and shall be secured by a continuing lien which is hereby created and impressed for the benefit of the Association upon the Lot against which each such Assessment is made. Each such Assessment, together with such interest costs and reasonable attorney's fees for the collection thereof, shall also constitute a personal obligation of the person or entity who was the record Owner of such Lot at the time of the Assessment. The personal obligation for delinquent Assessments shall not pass to successors in title unless expressly assumed by such successors; however, the lien upon the Lot shall continue until paid.

*Declaration of Covenants, Conditions and Restrictions*
*(Stone Meadow)*

**4.2** **Purpose of Assessments.** The Assessments levied by the Association shall be used exclusively for the purpose of promoting the recreation, health, safety and welfare of the Owners of the Lots, the improvement and maintenance of the Areas of Common Responsibility and any other property owned by the Association, and the performance and/or exercise of the rights and obligations of the Association arising hereunder. Assessments shall include, but not be limited to, funds to cover actual Association costs (including reasonable reserves) for all taxes, insurance, repair, replacement, maintenance and other activities as may from time to time be authorized by the Board of Directors; legal and accounting fees, and any fees for management services; expenses incurred in complying with any laws, ordinances or governmental requirements applicable to the Association or the Property; reasonable replacement and other reserves; and the cost of other facilities and service activities, including, but not limited to, mowing grass, grounds care, sprinkler system, landscaping, and other charges required or contemplated by this Declaration and/or that which the Board of Directors shall determine to be necessary or prudent to meet the primary purpose of the Association, including the establishment and maintenance of a reserve for repair, maintenance, taxes and other charges as specified herein.

**4.3** **Basis and Maximum of Regular Assessments and Transfer Fees on the Sale of Lots.**

(a)    The initial regular Assessment shall be an amount determined by the Board of Directors not to exceed Forty and No/100 Dollars ($40.00) per month or Four Hundred Eighty and No/100 Dollars ($480.00) per annum for each Lot.

(b)    From and after January 1 of the first full year after the date of recordation of this Declaration and each year thereafter, the maximum regular assessment may be increased by the Board of Directors by an amount up to ten percent (10%) over the preceding year's regular assessment. Any increase over and above ten percent (10%) of the previous year's regular assessment shall be done only by the prior approval of sixty-six and two-thirds percent (66-2/3%) of the outstanding votes of each class of Members entitled to vote (determined pursuant to Section 3.2 hereof) present at a meeting at which a quorum is present.

(c)    In addition to the regular assessment, as a condition to the sale of every Lot by an Owner other than Declarant and any Builder in the Development, a transfer fee of $150.00 shall be charged to the seller of such Lot being conveyed, and a transfer fee of $150.00 shall be charged to the purchaser of the Lot being conveyed and the pro-rata share of the regular assessments then due on such Lot shall be paid by the purchaser of the Lot to the Association. In addition to the transfer fees provided for herein, the Board of Directors may levy a capital improvement reserve fee, not to exceed $1,000.00 per Lot, to be charged to each purchaser of a Lot being conveyed for the purpose of creating a reserve to defray the cost, in whole or in part, of any nonrecurring maintenance or of the acquisition, construction, reconstruction, repair or replacement of a capital improvement located on any Common Area. The transfer fees and capital improvement reserve fee provided for herein may be increased from time to time, subject to the limitations provided hereby for the capital improvement reserve fee, as determined and approved by the Board of Directors.

**4.4** **Special Assessments.** In addition to the regular Assessment, the transfer fees and capital improvement reserve fee payable on the sale of Lots authorized above, the Association may levy, in any assessment year, a Special Assessment (herein so called) applicable to that year only, for the purpose of defraying, in whole or in part, the costs incurred by the Association pursuant to the provisions of this Declaration, provided that any such Special Assessment shall have the prior approval of sixty-six and two-thirds percent (66-2/3%) of the outstanding votes of each class of Members entitled to vote (determined pursuant to Section 3.2 hereof) present at a meeting at which a quorum is present. Any

Special Assessments shall be prorated based on the period of time the Owner owns the Lot during such year.

**4.5** **Notice and Quorum for any Action Authorized Under This Declaration.** Written notice of any meeting called for the purpose of taking any action authorized under this Declaration shall be given to all Members not less than ten (10) days nor more than sixty (60) days in advance of such meeting. At such meeting, the presence of Members or of written proxies entitled to cast twenty-five percent (25%) of all the votes entitled to be cast by each class of Members of the Association entitled to vote shall constitute a quorum. If the required quorum is not present, another meeting may be called subject to the same notice requirements and the required quorum at the subsequent meeting shall be one-half (1/2) of the required quorum at the preceding meeting.

**4.6** **Uniform Rate of Assessment.** Both the regular and Special Assessments shall be fixed at a uniform rate for all Lots, and shall commence and be due in accordance with the provisions of Section 4.7 hereof. Each Owner, (other than Declarant who may pay the deficiency described below), shall pay one hundred percent (100%) of such Owner's Assessments for each Lot owned.

**4.7** **Date of Commencement of Regular Assessments; Due Dates.**

(a)    The obligation of Owners to pay regular assessments provided for herein shall commence as to each Lot upon its conveyance by Declarant to any person or entity that is not affiliated with Declarant. The Assessments shall then be due on such payment dates as may be established by the Board of Directors. Assessments shall be due and payable on an annual basis unless otherwise designated by the Board of Directors.

(b)    Declarant is not required to pay Assessments with respect to the Lots owned by Declarant. Declarant may, but shall have no obligation to, pay any deficiency resulting from the expenses of the Association exceeding the amount of the Assessments received from the Owners.

(c)    Unless provided above, the regular Assessments for the first Assessment year shall be fixed by the Board of Directors prior to the sale of the first Lot to an Owner other than Declarant or a Builder. Except for the first Assessment year, the Board of Directors shall fix the amount of the regular Assessment at least thirty days in advance of each Assessment year, which shall be the calendar year; provided, however, that the Board of Directors shall have the right to adjust the regular Assessment upon thirty days written notice given to each Owner, as long as any such adjustment does not exceed the maximum permitted pursuant to Section 4.3 hereof. Written notice of the regular Assessment shall be given as soon as is practicable to every Owner subject thereto. The Association shall, upon demand at any time, furnish a certificate in writing signed either by the President, Vice-President, Treasurer or other authorized representative of the Association setting forth whether the regular and Special Assessments on a specified Lot have been paid and the amount of any delinquency. A reasonable charge may be made by the Association for the issuance of these certificates. Such certificates shall be conclusive evidence of payment of any Assessment therein stated to have been paid.

(d)    No Owner may exempt himself from liability for Assessments by waiver of the use or enjoyment of any portion of the Development or Areas of Common Responsibility or by abandonment of his Home or any Lot or improvements thereon.

### 4.8    Effect of Non-Payment of Assessments; Remedies of the Association.

(a)    All payments of the Assessments shall be made to the Association at its principal place of business or at such other place as the Association may otherwise direct or permit. Payment shall be made in full regardless of whether any Owner has any dispute with Declarant, a Builder, the Association, any other Owner or any other person or entity regarding any matter to which this Declaration relates or pertains. Payment of the Assessments shall be both a continuing affirmative covenant personal to the Owner and a continuing covenant running with the Lot.

(b)    Any Assessment provided for in this Declaration which is not paid when due shall be delinquent. If any such Assessment is not paid within thirty (30) days after the date of delinquency, the Assessment shall bear interest from the date of delinquency (with no notice required to be given), until paid, at the rate of eighteen percent (18%) per annum or the maximum rate allowed by law, whichever is the lesser. The Association may, at its option, bring an action at law against the Owner personally obligated to pay the same, or, upon compliance with the notice provisions hereof, foreclose the lien against the Lot as provided in Subsection 4.8(d) hereof. If any Owner is delinquent in paying its Assessments more than once in any twelve (12) month period, then in addition to the other rights and powers granted herein, the Board of Directors may impose a fine not to exceed $500.00 for each such delinquent payment. There shall be added to and included in the amount of such Assessment any and all expenses or costs incurred by the Association in collecting any delinquent Assessment and foreclosing such lien, including said interest, fines, and reasonable attorneys' fees. Each Owner vests in the Association or its assigns, the right and power to bring all actions at law or in equity foreclosing such lien against such Owner. Under no circumstances, however, shall Declarant or the Association be liable to any Owner or to any other person or entity for failure or inability to enforce any Assessments.

(c)    No action shall be brought to foreclose said Assessment lien or to proceed under the power of sale herein provided in less than thirty (30) days after the date a notice of claim of lien is deposited with the United States Mail, postage prepaid, certified or registered mail, return receipt requested, addressed to the Owner of said Lot, and a copy thereof is recorded by the Association in the Office of the County Clerk of the County; said notice of claim must recite a good and sufficient legal description of the Lot, the record Owner or reputed Owner thereof, the amount claimed (which may, at the Association's option, include interest on the unpaid Assessment at the rate set forth herein, plus attorney's fees and expenses of collection in connection with the debt secured by said lien), and the name and address of the Association.

(d)    Any such sale provided for above is to be conducted in accordance with the provisions applicable to the exercise of powers of sale in mortgages and deeds of trust, as set forth in Section 51.002 of the Property Code of the State of Texas (as it may be amended from time to time), or in any other manner permitted by law. Each Owner, by accepting a deed to a Lot, expressly grants to the Association a power of sale as set forth in said Section 51.002 of the Property Code in connection with the Assessment lien. The Association, through duly authorized agents, shall have the power to bid on the Lot at foreclosure sale and to acquire and hold, lease, mortgage and convey the same.

(e)    Upon the timely curing of any default for which a notice of claim of lien was filed by the Association, the officers of the Association are hereby authorized to file or record, as the case may be, an appropriate release of such notice, upon payment by the defaulting Owner of a fee, to be determined by the Association but not to exceed the actual cost of preparing and filing or recording the lien and the release. The Assessment lien and the right to foreclosure sale hereunder shall be in addition to and not in substitution of all other rights and remedies which the Association and its successors or assigns may

have hereunder and by law, including the right of suit to recover a money judgment for unpaid Assessments, as above provided.

(f)     In addition to the other rights and powers granted herein, the Board of Directors may suspend the right of an Owner to use any of the Areas of Common Responsibility during the period such Owner is delinquent in paying any Assessments. No Owner shall have the right to vote as a Member of the Association during the period that such Owner is delinquent in paying any Assessments. The Board of Directors may require that any delinquent Assessments be paid by cashier's or certified check or other good funds acceptable to the Board of Directors.

**4.9     Subordination of Lien to Lienholders.** The lien securing the Assessments provided for herein shall be expressly subordinate to the lien of any Lienholder. The sale or transfer of any Lot shall not affect the Assessment lien. However, the sale or transfer of any Lot subject to a Lienholder mortgage pursuant to a decree of foreclosure or a non-judicial foreclosure under such Lienholder mortgage or any proceeding in lieu of foreclosure thereof, shall extinguish the lien of such Assessments as to payments thereof which became due prior to such sale or transfer. No sale or transfer shall relieve such Lot from liability for any Assessment thereafter becoming due, in accordance with the terms herein provided.

**4.10     Management Agreements.** The Association shall be authorized to enter into management agreements with third parties in connection with the operation and management of the Development and the performance of its obligations hereunder. A copy of all such agreements shall be available to each Owner. Any and all management agreements entered into by the Association shall provide that said management agreement may be canceled with or without cause and without penalty by either party with thirty (30) days written notice. Any and all management agreements shall be for a term not to exceed one year and shall be made with a professional and responsible party or parties with proven management skills and experience managing a project of this type. The Association may, at its discretion, assume self management of the Development by the Association.

**4.11     Insurance Requirements.** The Association shall obtain insurance policies covering the Areas of Common Responsibility and covering all damage or injury caused by the negligence of the Association, and any of its employees, officers, directors and/or agents, and such insurance may include commercial general liability insurance, directors and officers liability insurance, and such other insurance as the Association may from time to time deem necessary or appropriate.

## ARTICLE V

## ARCHITECTURAL REVIEW COMMITTEE

**5.1     Appointment of Members.** An Architectural Control Committee (the "Committee"), which shall consist of three (3) members who shall be natural persons and who may or may not be employed by Declarant shall initially be appointed by Declarant. All matters before the Committee shall be decided by majority vote of its members. The members of the Committee shall serve until they resign or are removed by the party appointing them to the Committee (which the appointing party may do at any time). Subsequent appointments to the Committee shall be made by Declarant until such time as Declarant either relinquishes such power by written notice to the Board of Directors or all of the Lots owned by Declarant (as the same may be added or annexed to this Declaration) have been sold by Declarant; thereafter, appointments and removals from the Committee shall be made by the Board of Directors for such term as they shall designate.

*Declaration of Covenants, Conditions and Restrictions*
*(Stone Meadow)*                                                                                                  Page 9

**5.2** **Submission of Plans to Architectural Control Committee.** No Home, building, fence, wall, parking area, swimming pool, spa, pole, driveway, fountain, tennis court, landscaping, out-building, sprinkler system, exterior color or shape, or other improvement of any kind or type, or any alteration, addition to, change or modification of any of the foregoing, shall be constructed, erected or maintained upon any Lot, or the patio or garage used in connection with any Lot after such Lot has been sold by Declarant until the plans and specifications showing the nature, kind, color, shape, height, materials and location of the same are submitted to and approved in writing by the Committee. Plans and specification shall be submitted to the Committee at least fourteen (14) days prior to the commencement of any such construction or modification. Two (2) copies of the following shall be submitted for approval: a site plan showing the entire Lot with existing improvements, and floor plan and elevations of all faces of the proposed structure, a description of all exterior construction materials and such other materials, including engineering plans, if necessary, as the Committee shall reasonably require in order to enable the Committee to fully evaluate the proposed construction or modification. A copy of the above described plans and specifications may be retained by the Committee.

**5.3** **Approval of Plans.** The Committee shall review the plans and specifications and notify the Owner in writing of its approval or disapproval. If the Committee fails to approve or disapprove said plans and specifications in writing within thirty (30) days after the same has been submitted to it, they will be deemed to have been approved by the Committee. Any disapproval shall set forth the elements disapproved and the reason or reasons thereof. The Committee shall not have unbridled discretion with respect to taste, design and the standards set forth herein, but shall use commercially reasonable efforts to promote and ensure a high level of taste, design quality, aesthetic harmony, and conformity throughout the Property, consistent with standards established by this Declaration. The judgment of the Committee in this respect shall be final and conclusive and the Owner shall promptly correct the plans and specifications (if disapproved) and resubmit them for approval. No construction, alteration, change or modification shall commence until approval of the Committee is obtained. The Committee may approve any reasonable deviation from these covenants and restrictions as the Committee, in its sole and absolute discretion, deems consistent with the purpose hereof. No member of the Committee shall be liable to any Owner for any claims, causes of action or damages arising out of the denial of any submittal or grant of any deviation to an Owner. Future requests for deviations submitted hereunder shall be reviewed separately and apart from other such requests and the grant of a deviation to any Owner shall not constitute a waiver of the Committee's rights to strictly enforce the Declaration and the architectural standards provided herein against any other Owner.

**5.4** **Committee Members' Liability.** Neither Declarant, the Association, the Board of Directors, the Committee nor any employees, officers, directors or members thereof shall be liable for damages or otherwise to anyone submitting plans and specifications for approval or to any Owner affected by this Declaration by reason of mistake of judgment, negligence or nonfeasance arising out or in connection with the approval or disapproval or failure to approve or disapprove any plans or specifications. Any errors in or omissions from the plans or the site plan submitted to the Committee shall be the responsibility of the Owner of the Lot to which the improvements relate, and the Committee shall have no obligation to check for errors in or omissions from any such plans, or to check for such plans' compliance with the general provisions of this Declaration, City codes, state statutes or the common law, whether the same relate to Lot lines, building lines, easements or any other issue.

**5.5** **Builder Plans.** Notwithstanding anything to the contrary contained herein, once a particular set of plans and specifications for a Home to be constructed in the Development submitted by a Builder has been approved by the Committee or deemed approved, such Builder may construct Homes in the Development on any Lot in accordance with such plans and specifications without the necessity of obtaining subsequent approvals therefor, so long as there are no major material changes in the plans and

*Declaration of Covenants, Conditions and Restrictions*
*(Stone Meadow)*                                                                                     *Page 10*

specifications and the Committee approves of the location of the Homes to be constructed using such plans and specifications to prevent unnecessary duplication thereof within the Development.

**5.6** **Design Guidelines.** The Committee has the right to issue and amend Design Guidelines from time to time which may contain the specific provisions applicable to all of the Lots regarding style, basic site design issues, aesthetics of each home, the use of quality exterior finish materials, minimum landscaping plans for the Lots, and other issues concerning building standards, permitted construction or modification, and the Committee's operation. The Design Guidelines, together with this Declaration, will be used by the Committee to determine the approval of all plans. The Design Guidelines may be responsive to future technological advances or general changes in architectural designs and materials and related conditions.

## ARTICLE VI

## CONSTRUCTION OF IMPROVEMENTS AND USE OF LOTS

**6.1** **Residential Use.** Each Lot on the Property shall be used for single-family residential purposes only. No building shall be erected, altered, placed or permitted to remain on any Lot other than one (1) detached single-family residence per Lot, which residence may not exceed two and one-half (2½) stories in height, a private garage as provided below, and one (1) in-the-ground swimming pool and appurtenant sidewalks, driveways, curbs, fences, and storage and equipment buildings not otherwise prohibited hereby.

**6.2** **Single Family Use.** Each Home shall be limited to occupancy by only one family consisting of persons related by blood, adoption or marriage or no more than two unrelated persons residing together as a single housekeeping unit, in addition to any household or personal servant staff.

**6.3** **Garage.** Each Home shall have an enclosed garage suitable for parking a minimum of two standard size automobiles, which garage shall conform in design and materials with the main structure. All garage doors, whether overhead or otherwise, and any windows in a garage door, if applicable, shall remain fully closed at all reasonably practical times. No garage or other out-building shall be converted into a dwelling or living area by any Owner.

**6.4** **Restrictions on Resubdivision.** No Lot shall be subdivided into smaller lots.

**6.5** **Driveways.** All driveways shall conform to applicable City and other governmental specifications and requirements.

**6.6** **Uses Specifically Prohibited.**

(a) No temporary dwelling, shop, trailer or mobile home of any kind or any improvement of a temporary character (except children's playhouses, dog houses, greenhouses, gazebos and buildings for storage of lawn maintenance equipment which may be placed on a Lot only in places which are not visible from any street on which the Lot fronts) shall be permitted on any Lot except that a Builder or contractor may have temporary improvements (such as a sales office and/or construction trailer) on a specifically permitted Lot during construction of residences in the Development. No building material of any kind or character shall be placed or stored upon the Property until construction is ready to commence, and then such material shall be placed totally within the property lines of the Lot upon which the improvements are to be erected.

*Declaration of Covenants, Conditions and Restrictions*
*(Stone Meadow)*                                                                 *Page 11*

(b)     All Vehicles shall be parked, stored or placed so as not to be visible from any street or from ground level view from an adjoining Lot, except for temporary parking in the driveway constructed on a Lot.  On-street parking shall be limited to temporary parking of guests or invitees during parties, delivery of products or services, and similar limited (no more than twelve (12) hours) time periods.  No Vehicle shall be used as a residence or office temporarily or permanently. This restriction shall not apply to any Vehicle temporarily parked while in use for the construction, maintenance or repair of a residence in the Development.  All work on Vehicles (other than routine maintenance) shall be performed only in a fully enclosed garage completely screened from public view.

(c)     Trucks with tonnage in excess of one and one-half (1½) tons and any commercial Vehicle with signage or advertisement displays shall not be permitted to repetitively park overnight on the streets, driveways, or other areas of the Property, except those used by a Builder or its contractors during the construction of improvements.

(d)     No Vehicle of any size that transports flammable or explosive cargo may be parked, stored or kept on the Property at any time.

(e)     No Vehicle that is not in operating condition, does not have current license plates and inspection stickers, and/or is not in current use shall be parked or stored on the Property unless such Vehicle is parked or stored in a fully enclosed garage completely screened from public view.

(f)     No garage, garage house, out-building, or structure of a temporary character, such as a trailer, tent, shack, barn, underground tank or structure shall be used or occupied on the Property by any Owner, tenant or other person at any time as a dwelling or living area; provided, however, that any Builder may maintain and occupy model houses, sales offices and construction trailers in the Development in connection with its activities of constructing residences in the Development.

(g)     No oil drilling, oil development operation, oil refining, quarrying or mining operations of any kind shall be permitted in or on the Property, nor shall oil wells, tanks, tunnels, mineral excavations or shafts be permitted upon or in any part of the Property.  No derrick or other structure designed for use in quarrying or boring for oil, natural gas or other minerals shall be erected, maintained or permitted on the Property.

(h)     No animals, livestock or poultry of any kind shall be raised, bred or kept on the Property except that dogs, cats or other regular household pets may be kept as household pets.  Animals are not to be raised, bred or kept for commercial purposes or for food.  It is the purpose of these provisions to restrict the use of the Property so that no person shall quarter on the Property cows, horses, pigs, bees, hogs, sheep, goats, guinea fowl, ducks, chickens, turkeys, skunks or any other animals that may interfere with the peace and quiet and health and safety of the community.  No more than four (4) household pets will be permitted to reside in each Home.  Pets must be restrained or confined to the homeowner's rear yard within a secure fenced area or within the Home.  It is the pet owner's responsibility to keep the Lot clean and free of pet debris or odor noxious to adjoining Lots.  All animals must be properly registered and tagged for identification in accordance with local ordinances.

(i)     No Lot or other area of the Property shall be used as a dumping ground for rubbish, waste, or accumulation of unsightly materials of any kind, including without limitation, broken or rusty equipment, disassembled or inoperative Vehicles and discarded appliances and furniture.  Trash, garbage or other waste shall at all times be kept in clean, well maintained sanitary containers.  All trash containers shall at all times be screened from view from adjoining Lots and streets except as is reasonably necessary

*Declaration of Covenants, Conditions and Restrictions*
*(Stone Meadow)*

for trash pickup. Materials incident to construction of improvements may only be stored on Lots during construction of the improvement thereon.

(j)     No individual or private water supply system shall be permitted on any Lot.

(k)     No individual or private sewage disposal system shall be permitted on any Lot.

(l)     All air-conditioning apparatus, including window units, shall be installed so as not to be visible from any street in front of a Home. No air-conditioning apparatus or evaporative coolers shall be attached to any front wall or window of a Home.

(m)     Except as preempted by the FCC or other governmental authority, no Owner may erect or maintain antennas, antenna structures, satellite dishes or other equipment for receiving or sending sound, video or computer signals in or on the Property except that an Owner shall be permitted to erect or maintain (i) one (1) satellite dish or similar antenna that must be no greater than one (1) meter in diameter and must be placed in the least conspicuous location on a Lot where an acceptable quality signal can be received so long as it is completely screened from view from any adjacent street or other public area, and (ii) such devices that are fully contained within a Home or the attic in a Home and completely screened from public view.

(n)     No Lot or improvement thereon shall be used for a business, professional, commercial or manufacturing purposes of any kind for any length of time. No business activity shall be conducted on the Property which is not consistent with single-family residential purposes. No noxious or offensive activity shall be undertaken on the Property, nor shall anything be done which is or may become a public or private annoyance or nuisance to the Development.

(o)     No fence, wall, hedge or shrub planting which obstructs sight lines at an elevation between two feet (2') and six feet (6') above the roadway shall be placed or permitted to remain on any corner Lot within the triangular area formed by the intersection of street right-of-way lines and a line connecting them twenty feet (20') from the intersection of the street right-of-way lines, or in the case of a rounded property corner, from the intersection of the street right-of-way lines as extended. The same sight-line limitations shall apply on any Lot within the area that is ten feet (10') from the intersection of a street right-of-way line with the edge of a private driveway or alley pavement. No tree shall be permitted to remain within such distance of such intersections unless the foliage line is maintained at a minimum height of six feet (6') above the adjacent ground line.

(p)     Except for children's playhouses, dog houses, greenhouses, gazebos and buildings for storage of lawn maintenance equipment, no building previously constructed elsewhere shall be moved onto any Lot, it being the intention that only new construction be placed and erected on the Property.

(q)     Within those easements on each Lot as designated on the Plat of the Development or contained herein, no improvement, structure, planting or materials shall be placed or permitted to remain which might damage or interfere with the installation, operation and maintenance of the utilities within such easement, or which might alter the direction of flow within drainage channels or which might obstruct or retard the flow of water through drainage channels. The general grading, slope and drainage plan of a Lot as established by the City approved development plans may not be altered without the approval of the City and/or other appropriate agencies having authority to grant such approval.

(r)     No sign of any kind or character, including (a) any signs in the nature of a "protest" or complaint against Declarant or any Builder, (b) or that describe, malign or refer to the reputation, character

*Declaration of Covenants, Conditions and Restrictions*
*(Stone Meadow)*                                                                                                              Page 13

or building practices of Declarant or any Builder, or (c) discourage or otherwise impact or attempt to impact anyone's decision to acquire a Lot or Home in the Development, shall be displayed to the public view on any Lot or from any Home on any Lot except for (x) one professionally fabricated sign of not more than five (5) square feet advertising the property for rent or sale, (y) signs used by a Builder to advertise the property during the construction and sales period, or (z) political signs (of not more than five (5) square feet) in size advocating the election of one or more political candidates or the sponsorship of a political party, issue or proposal provided that such political signs shall not be erected more than thirty (30) days in advance of the election to which they pertain and shall be removed within ten (10) days after the election. All permitted signs shall be ground mounted to a height of not more than three feet (3'). Moreover, no Owner may use any public medium such as the "internet" or any broadcast or print medium or advertising to similarly malign or disparage the building quality or practices of any Builder, it being acknowledged by all Owners that any complaints or actions against any Builder are to be resolved in a private manner and any action that creates controversy or publicity for the Development or the quality of construction of any Home within the Development will diminish the quality and value of the Development. Declarant, any Builder, the Association, or their agents shall have the right, without notice, to remove any sign, billboard or other advertising structure that does not comply with the above, and in so doing shall not be subject to any liability for trespass or any other liability in connection with such removal.

(s)     Outdoor drying of clothes is prohibited.

(t)     Lawn mowers, rakes, carts and other yard equipment shall be stored away from view from adjacent Lots and streets when not in use.

(u)     Except within fireplaces in the main residential dwelling and barbeque equipment for outdoor cooking, no burning of trash, leaves or other items or material shall be permitted anywhere on the Property.

(v)     No use shall be conducted in the Development which could be violative of any deed restrictions, other encumbrances of record, zoning or planned use designation, or development or building restrictions or regulations imposed by the City or County, all as such may be applicable to the Development from time to time. Furthermore, no use shall be conducted which shall conflict with FHA or VA regulations (if applicable) or any regulation or ordinance of any other applicable governmental entity or agency.

(w)     To protect the safety and harmony of the Development, no person shall engage in picketing on any Lot, the Property, or easement within or adjacent to the Property, nor shall any Vehicle parked, stored, kept or driven in or adjacent to the Property bear or display any signs, slogans, symbols, words or decorations intended to create controversy, invite ridicule or disparagement, or interfere in any way with the exercise of the rights, occupancy or permitted activities of any Owner of the Property.

**6.7     Minimum Floor Area.**  The total air-conditioned living area of the main residential structure, as measured to the outside of exterior walls (but exclusive of open porches, garages, patios and detached accessory buildings), shall be not less than the minimum floor area required by the City.

**6.8     Building Materials.**  The total exterior wall area (excluding windows, doors and gables) of each Home constructed on a Lot shall be not less than the minimum percentage as established by the City by ordinance or building code requirement of brick, brick veneer, stone, stucco, stone veneer, or other masonry material permitted by City ordinance or building code.

*Declaration of Covenants, Conditions and Restrictions*
*(Stone Meadow)*                                                                    *Page 14*

**6.9** **Setback Requirements.** No dwelling, fence, wall or other improvement shall be located on any Lot nearer to the front lot line than the minimum setback lines shown on the Plat or as required by the City. Unless a Home is initially constructed by Declarant or a Builder in a different manner, all Homes erected or placed on any Lot shall face the road or street adjacent to the front of the Lot as shown on the recorded plat of the Property.

**6.10** **Fences and Walls.** All fences and walls shall be constructed only of masonry, brick, natural colored wood or other material as may be approved by the Committee. No chain link or similar type wire fences shall be allowed on any portion of a Lot that is visible from outside any boundary of the Lot. No fence or wall on any Lot shall extend nearer to any street than the front of the Home thereon. Except as otherwise specifically approved by Declarant, all streetside side yard fencing on corner Lots shall be set no closer to the abutting side street than the property line of such Lot. All fences must be at least six feet (6'), but not more than eight feet (8') in height. Any fence or portion thereof that faces a public street shall be constructed so that all structural members and, unless the Committee determines otherwise, support posts will be on the side of the fence away from the street and are not visible from any public right-of-way. All fences and walls shall be properly maintained in good condition by the Owner of the Lot upon which the fence or wall is situated. Rotting wood, leaning portions or those portions of a fence or wall in a state of disrepair shall be promptly repaired, maintained and/or replaced by the Owner of the Lot where upon the fence or wall is situated.

**6.11** **Sidewalks.** All walkways along public right-of-ways shall conform to the minimum property standards of the City, FHA and VA.

**6.12** **Mailboxes.** Mailboxes shall be initially constructed of a material and design approved by Declarant. If gangboxes are required by the U.S. Postal Service, no individual mailboxes shall be permitted.

**6.13** **Windows.** Windows, jambs and mullions shall be composed of anodized aluminum or wood. Except on a temporary basis to facilitate moving into and out of a Home, and in any event not more than thirty (30) days, no sheets, blankets, bedding, or similar material shall be placed on any window or door on any Home and in no event, shall aluminum, reflective film or similar treatment be placed on any window or glass door of any Home.

**6.14** **Roof.** The entire roof of each Home shall have a pitch of at least six inches (6") of rise to every twelve inches (12") of run, unless otherwise approved by Declarant and shall otherwise comply in all respects with any applicable laws or ordinances affecting the Lot. All roofing shall be, at a minimum, 20-year shingle and shall comply with requirements of the City.

**6.15** **Landscaping.** Landscaping of each Lot shall be completed within sixty (60) days, subject to extension for delays caused by inclement weather, after the Home construction is completed and shall include grassed front and side yards. At all times each Owner shall comply with all applicable landscaping and tree ordinances of the City.

**6.16** **General Maintenance of Lots.** Following occupancy of the Home upon any Lot, each Owner shall maintain and care for the Home, all improvements and all trees, foliage, plants, and lawns on the Lot and otherwise keep the Lot and all improvements thereon in good condition and repair and in conformity with the general character and quality of properties in the immediate area, such maintenance and repair to include but not be limited to: (i) the replacement of worn and/or rotted components, (ii) the regular painting of all exterior surface, (iii) the maintenance, repair and replacement of roofs, rain gutters, downspouts, exterior walls, windows, doors, walks, drives, parking areas and other exterior portions of

*Declaration of Covenants, Conditions and Restrictions*
*(Stone Meadow)*                                                                                      Page 15

the improvements to maintain an attractive appearance, and (iv) regular maintenance of all landscaping, trees and shrubs and regular mowing and edging of lawn and grass areas. Upon failure of any Owner to maintain a Lot owned by him in the manner prescribed herein, the Association or Declarant at its option and discretion, but without any obligation to do so, after ten (10) days written notice to such Owner to comply herewith, may enter, or cause a third party to enter upon such Owner's Lot and undertake to maintain and care for such Lot to the condition required hereunder and the Owner thereof shall be obligated, when presented with an itemized statement, to reimburse the Association or Declarant, as applicable, for the cost of such work together with interest thereon at the rate of eighteen percent (18%) per annum (but not in excess of the lawful maximum rate) from the date of disbursement to the Association or Declarant, as applicable, upon demand therefore. All sums owing by an Owner to the Association or Declarant, as applicable, shall be subject to the collection procedures and be secured by the lien provided for in Article IV.

**6.17    Development and Construction Activity.** Notwithstanding any other provision in this Declaration to the contrary, Declarant and any Builder shall be permitted to conduct on the Property all activities and operations normally associated with and convenient to the development, construction, and sale of single-family dwellings on the Property, including, without limiting the generality thereof, the construction and maintenance of model homes, sales offices, parking lots, trap fences, the erection of signs advertising the subdivision and lots or homes for sale, and placement and maintenance of temporary structures or trailers in connection with such activities.

## ARTICLE VII

## GENERAL PROVISIONS

### 7.1    Additional Easements.

(a)    Utility Easements.  As long as Class "B" membership shall be in effect, Declarant hereby reserves the right to grant perpetual, non-exclusive easements for the benefit of Declarant or its designees, upon, across, over, through and under any portion of the Property for the purpose of ingress, egress, installation, replacement, repair, maintenance, use and operation of all utility and service lines and service systems, public and private, including, without limitation, telephone and cable television. Declarant, for itself and its designees, reserves the right to retain title to any and all pipes, lines, cables or other improvements installed on or in such easements.  Upon cessation of Class "B" membership, the Association shall have the right to grant the easements described herein.

(b)    Continued Maintenance Easement.  In the event that the Owner fails to maintain the Lot as required herein, or in the event of emergency, or in the event the Association requires entry upon any Lot to repair or maintain any Area of Common Responsibility, the Association shall have the right, but not the obligation, to enter upon the Lot to make emergency repairs and to do other work reasonably necessary for the proper maintenance and operation of the Property. Entry upon the Lot as provided herein shall not be deemed a trespass, and the Association shall not be liable for any damage so created unless such damage is caused by the Association's willful misconduct or gross negligence.

(c)    Drainage Easements.  Easements for installation and maintenance of utilities, stormwater retention/detention ponds, and/or a conservation area are reserved as may be shown on the Plat. Within these easement areas, no structure, planting or other material shall be placed or permitted to remain which may damage or interfere with the installation and maintenance of utilities, or which may hinder or change the direction of flow of drainage channels or slopes in the easements. The easement area of each Lot and

all improvements contained therein shall be maintained continuously by the Owner of the Lot, except for those improvements for which a public authority, utility company or the Association is responsible. As long as Declarant owns any Lot, Declarant hereby reserves for the benefit of Declarant and any Builder a blanket easement on, over and under the ground within the Property to maintain and correct drainage of surface waters and other erosion controls in order to maintain reasonable standards of health, safety and appearance) and such parties shall be entitled to remove trees or vegetation, without liability for replacement or damages, as may be necessary to provide adequate drainage facilities. Notwithstanding the foregoing, nothing herein shall be interpreted to impose any duty upon Declarant or any Builder to correct or maintain any drainage facilities within the Property.

(d)    Temporary Completion Easement. All Lots shall be subject to an easement of ingress and egress for the benefit of Declarant, any Builder, their employees, subcontractors, successors and assigns, over and upon the front, side and rear yards of the Lots as may be expedient or necessary for the construction, servicing and completion of Homes and landscaping upon Lots adjacent thereto, provided that such easement shall terminate twelve (12) months after the date such burdened Lot is conveyed to the Owner by Declarant or a Builder.

(e)    Universal Easements. The Owner of each Lot (including Declarant so long as Declarant is the Owner of any Lot) is hereby granted an easement not to exceed two feet (2') in width from the boundary of the adjoining Lots over all adjoining Lots for the purpose of accommodating any unintentional encroachment or protrusion due to engineering or fence line errors, trees, landscaping or retaining walls located along property lines, errors in original construction or surveying, overhanging of roofs, eaves or other improvements, settlement or shifting of any building, or any other unintentional similar cause. In no event shall an easement for encroachment or protrusion be created in favor of an Owner or Owners of said encroachment or protrusion occurred due to willful misconduct of said Owner or Owners. Each of the easements hereinabove referred to shall be deemed to be established upon the recordation of this Declaration and shall be appurtenant to each affected Lot and shall pass with each conveyance of said Lot.

(f)    Screening Wall, Landscape, and Entry Feature Easements. All Lots shall be subject to a perpetual non-exclusive easement for the benefit of Declarant, the Association, any Builder and their employees, subcontractors, successors and assigns, for the purpose of (i) ingress and egress over and upon all portions of the Lots as may be expedient or necessary for the construction, installation, reconstruction, maintenance, repair, replacement, addition to, and improvement of any and all screening walls, fences, common area landscaping and entry features, together with all incidental improvements, as the same may be installed, constructed, reconstructed, improved, and added to from time-to-time by Declarant, any Builder, the Association, or any party designated by Declarant, upon, over, or across the front, side or rear yards of any of the Lots, and (ii) permanently locating, installing and maintaining any and all of such screening walls, fences, common area landscaping and entry features, together with all incidental improvements.

(g)    Specific Common Area Easements. Perpetual non-exclusive easements for the benefit of Declarant, the Association, and their employees, subcontractors, successors and assigns, for the purpose of the construction, installation, reconstruction, maintenance, repair, replacement, addition to, permanent location, and improvement of Development screening walls, entry features and landscaping, and fencing, together with all incidental improvements, is hereby reserved and created over, across, upon, and under the portion of the Property described on Exhibit "A" attached hereto (the "Common Area Easement No. 1"), Exhibit "B" attached hereto (the "Common Area Easement No. 2"), Exhibit "C" attached hereto ("Common Area Easement No. 3") and Exhibit "D" attached hereto (the "Common Area Easement No. 4").

*Declaration of Covenants, Conditions and Restrictions*
*(Stone Meadow)*                                                                                          *Page 17*

7.2    **Enforcement.**  Declarant, the Association, or any Owner, shall have the right to enforce, by any proceeding at law or in equity, all restrictions, conditions, covenants, reservations, liens and charges now or hereafter imposed by the provisions of this Declaration the Bylaws and Articles of Incorporation.  Failure by the Declarant, the Association or by any Owner to enforce any covenant, condition or restriction herein contained, the Bylaws or the Articles of Incorporation shall in no event be deemed a waiver of the right to do so thereafter.  With respect to any litigation hereunder, the prevailing party shall be entitled to recover reasonable attorneys fees from the nonprevailing party.

7.3    **Severability.**  If any condition, covenant or restriction herein contained shall be invalid, which invalidity shall not be presumed until the same is determined by the final judgment or order of a court of competent jurisdiction, such invalidity shall in no way affect any other condition, covenant or restriction, each of which shall remain in full force and effect.

7.4    **Term.**  The covenants, conditions and restrictions of this Declaration shall run with and bind the Property, and shall inure to the benefit of and be enforceable by Declarant (during the time it owns any Lots), the Association, or the Owner of any Lot subject to this Declaration, their respective legal representatives, heirs, successors and assigns, for a term of thirty (30) years from the date this Declaration is recorded, after which time said covenants shall be automatically extended for successive periods of ten (10) years, unless by vote of the then Owners of seventy percent (70%) of the Lots (and the City, if then a party hereto) agree in writing to terminate or change this Declaration in whole or in part and such writing is recorded in the Real Property Records of the County.

7.5    **Amendment.**

(a)    This Declaration may be amended or modified upon the express consent of at least sixty-six and two-thirds percent (66-2/3%) of the outstanding votes of each class of Members entitled to vote (determined pursuant to Section 3.2 hereof) present at a meeting at which a quorum is present; provided, however, so long as Declarant continues a Class "B" Member, this Declaration may not be amended without first obtaining the prior written consent of Declarant as evidenced by Declarant's execution of the recorded amendment instrument.  If the proposed amendment involves a modification of any of the Association's agreements, covenants or restrictions pertaining to the use, maintenance, operation and/or supervision of any Areas of Common Responsibilities, the approval of the City must also be obtained for such amendment if required by applicable City ordinances or regulations.  Any and all amendments, if any, shall be recorded in the Real Property Records of the County.  Notwithstanding the foregoing, Declarant shall have the right to execute and record amendments to this Declaration without the consent or approval of any other party (i) so long as Declarant continues as a Class "B" Member, or (ii) to correct technical errors, cause this Declaration to be in compliance with any and all applicable laws, rules, and regulations of any applicable governmental authority, including the FHA and VA, or clarify any provision hereof.

(b)    Declarant intends that this Declaration may be amended to comply (if not in compliance) with all requirements of the Federal Home Loan Mortgage Corporation ("FHLMC"), Federal National Mortgage Association ("FNMA"), FHA and VA.  Notwithstanding anything to the contrary contained herein, if this Declaration does not comply with FHLMC, FNMA, VA or FHA requirements, the Board of Directors and/or Declarant shall have the power in its discretion (on behalf of the Association and each and every Owner) to amend the terms of this Declaration or to enter into any agreement with FHLMC, FNMA, VA, and FHA, or their respective designees, reasonably required by FHLMC, FNMA, VA or FHA to allow this Declaration to comply with such requirements.  Should the FHLMC, FNMA, VA or FHA subsequently delete any of their respective requirements which necessitate modification of any of the provisions of this Declaration or make any such requirements less stringent, the Board of Directors

and/or Declarant, without approval of the Owners, may, upon reasonable justification, cause an amendment to this Declaration to be executed and recorded to reflect such changes.

**7.6** **Gender and Grammar.** The singular wherever used herein shall be construed to mean the plural when applicable, and the necessary grammatical changes required to make the provisions hereof apply either to corporations or individuals, men or women, in all cases shall be assumed as though fully expressed in each case.

**7.7** **Remedies.** Enforcement of these covenants and restrictions shall be by any proceeding at law or in equity, including, without limitation, an action for injunctive relief, it being acknowledged and agreed that a violation of the covenants, conditions and restrictions contained herein could cause irreparable injury to Declarant and/or the other Owners and that Declarant's and/or the other Owner's remedies at law for any breach of the Owners' obligations contained herein would be inadequate. Enforcement may be commenced by the Association, Declarant, the City, or any Owner against any person or persons violating or attempting to violate them, and failure by the Association, Declarant, the City, or any Owner to enforce any covenant or restriction herein contained shall in no event be deemed a waiver of the right to do so thereafter. The rights created herein are unique and enforceable by specific performance. In addition to any remedies at law or equity available hereunder, each Owner may also be subject to a fine to be levied by the Association and determined by the Board of Directors, that shall not to exceed $100.00 per day (to be collected by the Association) for each day that such Owner fails to comply with covenants, conditions and restrictions contained herein. Such fine levied by the Association shall be due and payable at such time as is designated by the Board of Directors. All fines levied by the Association at the time levied shall be added to and included in the amount of the Assessment due from such Owner and shall be subject to the same remedies and rights of enforcement as Assessments set forth in this Declaration.

**7.8** **Notices to Owner.** Any notice required to be given to any Owner under the provisions of this Declaration shall be deemed to have been properly delivered forty-eight (48) hours after deposited in the United States Mail, postage prepaid, certified or registered mail, return receipt requested, and addressed to the last known address of the person who appears as Owner in the public records at the time of such mailing.

**7.9** **Headings.** The headings contained in this Declaration are for reference purposes only and shall not in any way affect the meaning or interpretation of this Declaration. Words of any gender used herein shall be held and construed to include any other gender and words in the singular, shall be held to include the plural and visa versa unless the context requires otherwise.

**7.10** **Formation of Association; Inspection of Documents, Books and Records.** The Association shall be formed by Declarant as a non-profit corporation in accordance with the laws of the State of Texas. Management and governance of the Association shall be implemented and/or undertaken in accordance with its Articles of Incorporation, in accordance with this Declaration, and in accordance with the Bylaws which shall be adopted by the Association following its formation. The Association shall make available copies of the Declaration, Bylaws, Articles of Incorporation, rules and regulations governing the Association as well as the books, records and financial statements of the Association for inspection by Owners or any Mortgagee during regular business hours or other reasonable times.

**7.11** **Indemnity.** To the fullest extent permitted by applicable law, the Association shall indemnity, defend and hold harmless Declarant, the Board of Directors, the Committee, the officers of the Association, and each director, officer, employee and agent of Declarant, the Board of Directors and the Committee from all judgments, penalties (including excise and similar taxes), fines, settlements and

reasonable expenses (including attorneys' fees) incurred by such indemnified person arising out of or in connection with such indemnified persons' acts performed in good faith pursuant to this Declaration. SUCH INDEMNITY TO INCLUDE MATTERS ARISING AS A RESULT OF THE SOLE OR CONCURRENT NEGLIGENCE OF THE INDEMNIFIED PERSON, TO THE EXTENT PERMITTED BY APPLICABLE LAW, BUT SHALL NOT INCLUDE ACTS OF WILLFUL MISCONDUCT OR GROSS NEGLIGENCE.

7.12    **FHA/VA Approval Requirement.** As long as there remains any Class "B" Member and any first lien mortgage is in effect with respect to any Lot which is insured by FHA or VA, the following actions shall require prior approval of FHA or VA if such approval is required under the then applicable FHA or VA regulations: amendment of the Articles of Incorporation, Declaration or Bylaws; mortgaging or dedication of the Areas of Common Responsibility; and dissolution of the Association.

7.13    **Failure of Declarant or Association to Perform Duties.** Should Declarant or the Association fail to carry out its duties as specified in this Declaration, the City or its lawful agents shall have the right and ability, after due notice to Declarant or the Association, to remove any landscape systems, features or elements that are the responsibility of and cease to be maintained by Declarant or the Association, as applicable; to perform the responsibilities of Declarant or the Association, as applicable, if such party fails to do so in compliance with any of the provisions of this Declaration or of any applicable City codes or regulations; to assess Declarant or the Association, as applicable, for all costs incurred by the City in performing said responsibilities if Declarant or the Association, as applicable, fails to do so; and/or to avail itself of any other enforcement actions available to the City pursuant to state law or City codes and regulations. Should the City exercise its rights as specified above, the party failing to perform shall indemnify and hold harmless the City from any and all costs, expenses, suits, demands, liabilities or damages, including attorney's fees and costs of suit, incurred or resulting from the City's removal of any landscape systems, features or elements that cease to be maintained by Declarant or the Association, as applicable, or from the City's performance of the aforementioned operations, maintenance or supervision responsibilities. The obligations described in this paragraph are solely obligations of the Association (and Declarant if Declarant remains so obligated), and no other party, including without limitation, Declarant (assuming Declarant is no longer so obligated) or any Owner, shall have any liabilities or obligations in connection therewith.

7.14    **Binding Effect.** Each of the conditions, covenants, restrictions and agreements herein contained is made for the mutual benefit of, and is binding upon, each and every person acquiring any part of the Property, it being understood that such conditions, covenants, restrictions and agreements are not for the benefit of the owner of any land except land in the Development. This Declaration, when executed, shall be filed of record in the Real Property Records of the County so that each and every Owner or purchaser of any portion of the Property is on notice of the conditions, covenants, restrictions and agreements herein contained. In the event any of the Lots in the Development have been conveyed to third parties prior to the recordation of this Declaration, such Lots may be encumbered by and fully subject to all of the terms, covenants, conditions and restrictions set forth in this Declaration upon the executed consent of such third parties, which such consent shall be filed of record in the Real Property Records of the County.

7.15    **Recorded Plat; Other Authorities.** All dedications, limitations, restrictions and reservations that are shown on the Plat are deemed to be incorporated herein and shall be construed as being adopted in each contract, deed or conveyance executed or to be executed by Declarant or any Owner, conveying the Lots, whether specifically referred to therein or not. If other authorities, such as the City or the County, impose more demanding, expensive, extensive or restrictive requirements than those that are set forth herein (through zoning or otherwise), the requirements of such authorities shall be

*Declaration of Covenants, Conditions and Restrictions*
*(Stone Meadow)*

complied with. Other authorities' imposition of lesser requirements than those that are set forth herein shall not supersede or diminish the requirements that are set forth herein.

**7.16 Additions to the Development.** Additional property may become subject to this Declaration in any of the following manners:

(a) Declarant may without the joinder, approval or consent of any person(s) or entity(ies) add or annex additional real property to the scheme of this Declaration by filing of record a Supplementary Declaration of Covenants, Conditions and Restrictions which shall extend the scheme of this Declaration to such property; provided, however, that such Supplementary Declaration may contain such complementary additions and modifications of the covenants, conditions and restrictions contained in this Declaration as may be necessary to reflect the different character, if any, of the added properties and as are not inconsistent with this Declaration.

(b) In the event any person or entity other than Declarant desires to add or annex additional residential and/or common areas to the scheme of this Declaration, such annexation must have the prior written consent and approval of the majority of the outstanding votes within each voting class of the Association. Any additions made pursuant to paragraphs (a) and (b) of this Section, when added, shall automatically extend the jurisdiction, functions, duties and membership of the Association to the properties added.

(c) Declarant shall have the right and option, without the joinder, approval or consent of any person(s) or entity(ies) to cause the Association to merge or consolidate with any similar association then having jurisdiction over real property located (in whole or part) within 1 mile of any real property then subject to the jurisdiction of the Association. Upon a merger or consolidation of the Association with another association, its properties, rights and obligations may, by operation of law, be transferred to another surviving or consolidated association or, alternatively, the properties, rights and obligations of another association may, by operation of law, be added to the properties, rights and obligations of the Association as a surviving corporation pursuant to a merger. The surviving or consolidated association may administer the covenants and restrictions established by this Declaration within the Property together with the covenants and restrictions established upon any other properties as one scheme.

(d) In determining the number of Lots owned by Declarant for purposes of Class "B" membership status according to Section 3.2 above, the total number of Lots covered by this Declaration including all Lots added or annexed thereto shall be considered. If Class "B" membership has previously expired due to the ratio provisions set forth in Section 3.2(b)(i) above, but addition or annexation of additional property or Lots restores the ratio of Lots owned by Declarant to the number required for Class "B" membership within the period provided in Section 3.2, such Class "B" membership shall be reinstated.

**7.17 No Warranty of Enforceability.** While Declarant has no reason to believe that any of the restrictive covenants or other terms or provisions contained in this Declaration are or may be invalid or unenforceable for any reason or to any extent, Declarant makes no warranty or representation as to the present or future validity or enforceability of any such restrictive covenants or other terms or provisions contained in this Declaration. Any Owner acquiring a Lot in the Development in reliance on one or more of such restrictive covenants, terms or provisions shall assume all risks of the validity and enforceability thereof and, by acquiring the Lot, agrees to hold Declarant, the Association and the Committee harmless therefrom. Declarant shall not be responsible for the acts or omissions of any individual, entity or other Owners.

**7.18** **Right of Enforcement.** The failure by Declarant, any Builder, the Association or the Committee to enforce any provision of this Declaration shall in no event subject Declarant, such Builder, the Association or the Committee to any claims, liability, costs or expense; it being the express intent of this Declaration to provide Declarant with the right (such right to be exercised at its sole and absolute discretion), but not the obligation to enforce the terms of this Declaration for the benefit of any Owner(s) of any Lot(s) in the Development.

**7.19** **Residential Construction Liability Act.** Without waiving any rights under law or equity, all Owners acknowledge, covenant and agree that residential construction defect claims regarding any Home against Declarant or any homebuilder in Texas are governed by the Texas Residential Construction Liability Act (Tex. Prop. Code §27.001 *et seq.*, as amended) which preempts the Texas Deceptive Trade Practices Act (Tex. Bus. & Com. Code §17.41 *et seq.*, as amended) and any other law.

**7.20** **EPA Compliance.** The Owner of each Lot agrees to comply with all EPA rules and regulations regarding erosion control and compliance with a Storm Water Pollution Prevention Plan affecting the Lots (the "Plan") which will include elements necessary for compliance with the nationwide general permit for construction activities administered by the EPA under the National Pollutant Discharge Elimination System. Each Owner acknowledges that Declarant and any Builder will not bear any responsibility for complying with a Plan on any Lot after the sale of each Lot in the Development.

**7.21** **Soil Movement.** Each Owner acknowledges that the failure or excessive movement of any foundation of any Home in the Development can result in the diminished value and overall desirability of the entire Development. Each Owner agrees and understands that the maintenance of the moisture content of the soils on each Lot is necessary to preserve the structural integrity of each Home in the Development. Each Owner also acknowledges that the long term value and desirability of the Development is contingent upon each Owner maintaining its Home so that no structural failure or excessive soil movement occurs within the Development.

EACH OWNER IS HEREBY NOTIFIED THAT THE SOIL COMPOSITION IN NORTH TEXAS IN GENERAL AND THE DEVELOPMENT IN PARTICULAR AND THE CONDITION OF THE LOTS MAY RESULT IN THE SWELLING AND/OR CONTRACTION OF THE SOIL IN AND AROUND THE LOT IF THE OWNER OF THE LOT DOES NOT EXERCISE THE PROPER CARE AND MAINTENANCE OF THE SOIL REQUIRED TO PREVENT SOIL MOVEMENT.

If the Owner fails to exercise the necessary precautions, damage, settlement, movement or upheaval to the foundation and structural failure may occur. Owners are highly encouraged to install and maintain proper irrigation around their Home or take such other measures to ensure even, proportional, and prudent watering around the foundation of the Home.

By each Owner's acceptance of a deed to any Lot, each Owner, on behalf of Owner and Owner's representatives, successors and assigns, hereby acknowledges that Declarant and all Builders in the Development shall not be responsible or liable for, and Owner shall assume all risk and consequences of, any damage, settlement, movement or upheaval to the foundation, structural failure, or any damage to any other part of the Home caused by Owner's failure to exercise proper care and maintenance of the soil required to prevent soil movement, and hereby releases and forever discharges all Builders in the Development and Declarant and their respective shareholders, members, officers, directors, partners, employees, agents, representatives, affiliates, attorneys, successors and assigns, of and from any and all claim for the relief and causes of action, liabilities, damages and claims whatsoever, known or unknown, direct or indirect, arising from or relating to Owner's failure to exercise proper care and maintenance of the soil required to prevent soil movement, including but not limited to, any damage caused by or related

*Declaration of Covenants, Conditions and Restrictions*
*(Stone Meadow)*

in any fashion to the failure or improper or uneven watering of the Lot, planting of improper vegetation near the foundation, or any action by any Owner that affects the drainage of any Lot.

**IN WITNESS WHEREOF**, the undersigned, being Declarant herein, has executed this instrument on the 14 day of December, 2000.

**LEGACY/MONTEREY HOMES, L.P.,**
**an Arizona limited partnership**

By:   **MTH-TEXAS GP, INC.,**
      **an Arizona corporation, General Partner**

By:_____

Stewart Parker, Dallas Division President

**STATE OF TEXAS**

**COUNTY OF COLLIN**

    This instrument was acknowledged before me on the 14 day of December, 2000, by Stewart Parker, Dallas Division President of MTH-TEXAS GP, INC., a Texas corporation, General Partner of LEGACY/MONTEREY HOMES, L.P., an Arizona limited partnership, on behalf of said limited partnership.

_____

Notary Public, State of Texas

legacy\stonemeadow\declar-4.ccr

> JEANINE W. WRIGHT
> Notary Public
> State of Texas
> Comm. Expires 2-29-2004

*Declaration of Covenants, Conditions and Restrictions*
*(Stone Meadow)*

COMMON AREA EASEMENT NO. 1
EXHIBIT "A"

PROPOSED 5' WALL MAINTENANCE EASEMENT
ACROSS LOTS 23, 24 & 25, BLOCK A
STONE MEADOW ADDITION
FORT WORTH, TEXAS

BEING a 5' strip of land located in the Isabel Flores Survey, Abstract No. 507, City of Fort Worth, Tarrant County, Texas, and being across the rear of Lots 23, 24 & 25, Block A of Stone Meadow Addition, an Addition to the City of Fort Worth according to the Map thereof recorded in Cabinet A, Slide 6107 of the Map Records of Tarrant County, Texas, and being more particularly described as follows:

BEGINNING at a ½" iron rod with plastic cap stamped "USA INC PROP COR" found (hereinafter called ½" iron rod found) for corner in the West line of South Hulen Street at the Northeast corner of the above cited Lot 23;

THENCE S. 00 deg. 01 min. 18 sec. E. along the West line of South Hulen Street and the East line of Lot 23 and the above cited Lot 24 a distance of 195.00 feet to a ½" iron rod found for corner at the Southeast corner of Lot 24, said point also being the Northeast corner of Lot 25, said point also being the most Northerly corner of Lot 40;

THENCE S. 11 deg. 17 min. 55 sec. W. along the East line of Lot 25 and the most Northerly Northwest line of Lot 40 a distance of 25.47 feet to a point for corner;

THENCE N. 00 deg. 01 min. 18 sec. W. a distance of 220.00 feet to a point for corner in the North line of Lot 23;

THENCE S. 89 deg. 44 min. 42 sec. E. along the North line of Lot 23 a distance of 5.00 feet to the **POINT OF BEGINNING** and containing 0.024 acres or 1,038 square feet of land.

Unofficial Document



NOTE:

Bearing are based on the West line of Stone Meadow Addition, as recorded in Cabinet A, Slide 6107 of the Map Records of Tarrant County, Texas.

W. COULSTING, ET UX
VOL. 2804, PG. 479
D.R.T.C.T.

S 89°44'42" E
5.00'

POINT OF
BEGINNING

1/2" IRF CAPPED
"USA INC PROP COR"

LOT 22

EASEMENT NO. 1
PROPOSED 5' WALL
MAINTENANCE ESMT.
0.024 ACRES
(1038 SQUARE FEET)

220.00'
195.00'

LOT 23

BLOCK A

SOUTH HULEN STREET
(120' R.O.W.)

SCALE 1" = 40'

BEDROCK DRIVE
(50' R.O.W.)

S 00°01'18" E
N 00°01'18" W

EXISTING 7.5' UTILITY ESMT.

LOT 24

COMMON AREA EASEMENT NO. 1
EXHIBIT "A"

PROPOSED 5' WALL MAINTENANCE EASEMENT
ACROSS LOTS 23, 24 & 25, BLOCK A
STONE MEADOW ADDITION
situated in the
ISABEL FLORES Survey, Abstract No. 507
City of FORT WORTH, TARRANT COUNTY, Texas

1/2" IRF CAPPED
"USA INC PROP COR"

LOT 25

S 11°17'55" W
25.47'

STATE OF TEXAS
REGISTERED
TODD B. TURNER
4859
PROFESSIONAL
LAND SURVEYOR

Todd B. Turner, RPLS 4859    11-3-00    Date
99045

LOT 26

LOT 40

USA Professional Services Group, Inc.
8700 Stemmons Freeway, Suite 400
Dallas, Texas 75247
(214) 634-3300 fax (214) 634-3338
Page 2 of 2.

COMMON AREA EASEMENT NO. 2
EXHIBIT "B"

PROPOSED WALL MAINTENANCE EASEMENT
ACROSS LOTS 29 & 30, BLOCK A
STONE MEADOW ADDITION
FORT WORTH, TEXAS

BEING a tract of land located in the Isabel Flores Survey, Abstract No. 507, City of Fort Worth, Tarrant County, Texas, and being across the rear of Lots 29 & 30, Block A of Stone Meadow Addition, an Addition to the City of Fort Worth according to the Map thereof recorded in Cabinet A, Slide 6187 of the Map Records of Tarrant County, Texas, and being more particularly described as follows:

BEGINNING at a ½" iron rod with plastic cap stamped "USA INC PROP COR" found (hereinafter called ½" iron rod found) for corner at the most Southerly Southeast corner of the above cited Lot 30;

THENCE N. 89 deg. 48 min. 42 sec. W. along the South line of Lot 30 a distance of 22.50 feet to a point for corner at the beginning of a non-tangent curve to the right;

THENCE in a Northeasterly direction along said non-tangent curve to the right having a central angle of 89 deg. 43 min. 24 sec., a radius of 72.50 feet, a chord bearing of S. 45 deg. 07 min. 00 sec. W., a chord distance of 102.28 and an arc length of 113.53 feet to a point for corner in the East line of the above cited Lot 29;

THENCE S. 00 deg. 01 min. 18 sec. E. along the East line of Lot 29 a distance of 22.50 feet to a ½" iron rod found for corner at the most Easterly Southeast corner of Lot 29;

THENCE S. 45 deg. 07 min. 00 sec. W. along the Southeast line of Lots 29 and Lot 30 a distance of 70.54 feet to the POINT OF BEGINNING and containing 0.066 acres or 2,866 square feet of land.



**NOTE:**

Bearing are based on the West line of
Stone Meadow Addition, as recorded in
Cabinet A, Slide 6107 of the Map Records
of Tarrant County, Texas.

LOT 29

BLOCK A

LOT 30

EASEMENT NO. 2
PROPOSED WALL
MAINTENANCE ESMT.
0.066 ACRES
(2,866 SQUARE FEET)

Δ=89°43'24" R=72.50' L=113.53' CB=S45°07'00"W CH=102.28'

EXISTING 7.5' UTILITY ESMT.

LOT 40

S 00°01'18" E
22.50'

1/2" IRF CAPPED
"USA INC PROP COR"

SOUTH MULLEN STREET
(120' R.O.W.)

SCALE 1" = 20'

S 45°07'00" W

65.95'

10.54'

32.71'

LOT 40

EXISTING 7.5' UTILITY ESMT.

LOT 40

POINT OF
BEGINNING

N 89°44'42" W 1/2" IRF CAPPED
"USA INC PROP COR"
22.50'

STONE RIVER TRAIL
(90' R.O.W.)

TODD B. TURNER RPLS 4859    11-3-00
99045    Date

**COMMON AREA EASEMENT NO. 2**
**EXHIBIT "B"**

PROPOSED WALL MAINTENANCE EASEMENT
ACROSS LOTS 29 & 30, BLOCK A
STONE MEADOW ADDITION
situated in the
ISABEL FLORES Survey, Abstract No. 507
City of FORT WORTH, TARRANT County, Texas

**USA Professional Services Group, Inc.**
8700 Stemmons Freeway, Suite 400
Dallas, Texas 75247
(214) 634-3300 fax (214) 634-3338
Page 2 of 2.

STATE OF TEXAS
REGISTERED
TODD B. TURNER
4859
PROFESSIONAL
LAND SURVEYOR

COMMON AREA EASEMENT NO. 3
EXHIBIT "C"

PROPOSED WALL MAINTENANCE EASEMENT
ACROSS LOT 16, BLOCK D
STONE MEADOW ADDITION
FORT WORTH, TEXAS

BEING a tract of land located in the Isabel Flores Survey, Abstract No. 507, City of Fort Worth, Tarrant County, Texas, and being across the rear of Lot 16, Block D of Stone Meadow Addition, an Addition to the City of Fort Worth according to the Map thereof recorded in Cabinet A, Slide 6107 of the Map Records of Tarrant County, Texas, and being more particularly described as follows:

BEGINNING at a ½" iron rod with plastic cap stamped "USA INC PROP COR" found (hereinafter called ½" iron rod found) for corner at the most Northerly Northeast corner of the above cited Lot 16;

THENCE S. 44 deg. 53 min. 00 sec. E. along the Northeast line of Lot 16 a distance of 70.88 feet to a ½" iron rod found for corner at the most Easterly Northeast corner of Lot 16;

THENCE S. 00 deg. 01 min. 18 sec. E. along the East line of Lot 16 a distance of 22.50 feet to a point for corner at the beginning of a non-tangent curve to the right;

THENCE in a Northwesterly direction along said curve to the right having a central angle of 90 deg. 16 min. 36 sec., a radius of 72.50 feet, a chord bearing of N. 44 deg. 53 min. 00 sec. W., a chord distance of 102.78 feet and an arc length of 114.23 feet to a point for corner in the North line of Lot 16;

THENCE S. 89 deg. 44 min. 42 sec. E. along the North line of Lot 16 a distance of 22.50 feet to the POINT OF BEGINNING and containing 0.066 acres or 2,891 square feet of land.

STONE RIVER TRAIL
(90' R.O.W.)

LOT 1

S 89°44'42" E
22.50'

POINT OF BEGINNING

1/2" IRF CAPPED
"USA INC PROP COR"

LOT 1

NOTE:

Bearing are based on the West line of Stone Meadow Addition, as recorded in Cabinet A, Slide 6107 of the Map Records of Tarrant County, Texas.

SOUTH HULEN STREET
(120' R.O.W.)

Δ=90°16'36" R=72.50'

ROCK CANYON COURT
(50' R.O.W.)

S 44°53'00" E
70.88'

EASEMENT NO. 3
PROPOSED WALL
MAINTENANCE ESMT.
0.066 ACRES
(2.891 SQUARE FEET)

L=114.23' CB=N 44°53'00"W CH=102.78'

1/2" IRF CAPPED
"USA INC PROP COR"

S 00°01'18"
22.50'

LOT 16

BLOCK D

10'

LOT 1

EXISTING 7.5' UTILITY ESMT.

SCALE 1" = 20'

COMMON AREA EASEMENT NO. 3
EXHIBIT "C"

PROPOSED WALL MAINTENANCE EASEMENT
ACROSS LOT 16 BLOCK D
STONE MEADOW ADDITION
situated in the
ISABEL FLORES Survey, Abstract No. 507
City of FORT WORTH, TARRANT County, Texas

USA Professional Services Group, Inc.
8700 Stemmons Freeway, Suite 400
Dallas, Texas 75247
(214) 634-3300 fax (214) 634-3338
Page 2 of 2.

STATE OF TEXAS
REGISTERED
TODD B. TURNER
4859
PROFESSIONAL
LAND SURVEYOR

Todd B. Turner, RPLS 4859      Date      11-3-00
99045

COMMON AREA EASEMENT NO. 4
EXHIBIT "D"

PROPOSED WALL MAINTENANCE EASEMENT
ACROSS LOTS 20, 21, 22, 23, 24, 25, 26 & 27, BLOCK D
STONE MEADOW ADDITION
FORT WORTH, TEXAS

BEING a strip of land located in the Isabel Flores Survey, Abstract No. 507, City of Fort Worth, Tarrant County, Texas, and being across the rear of Lot 20, 21, 22, 23, 24, 25, 26 & 27, Block D of Stone Meadow Addition, an Addition to the City of Fort Worth according to the Map thereof recorded in Cabinet A, Slide 6107 of the Map Records of Tarrant County, Texas, and being more particularly described as follows:

BEGINNING at a ½" iron rod with plastic cap stamped "USA INC PROP COR" found (hereinafter called ½" iron rod found) for corner in the West line of South Hulen Street at the Southeast corner of the above-cited Lot 27;

THENCE N. 89 deg. 53 min. 01 sec. W. along the South line of Lot 27 a distance of 5.00 feet to a point for corner;

THENCE N. 00 deg. 01 min. 18 sec. W. a distance of 523.63 feet to a point for corner on the East line of Lot 20;

THENCE S. 09 deg. 28 min. 49 sec. E. along the East line of Lot 20 a distance of 30.43 feet to a ½" iron rod found for corner in the West line of South Hulen Street at the Southeast corner of Lot 20, said point also being the Northeast corner of Lot 21;

THENCE S. 00 deg. 01 min. 18 sec. E. along the West line of South Hulen Street a distance of 493.63 feet to the **POINT OF BEGINNING** and containing 0.058 acres or 2,543 square feet of land.

PAGE 1 OF 2

SCALE 1" = 60'

SOUTH HULEN STREET
(120' R.O.W.)

POINT OF
BEGINNING

S 09°28'49" E
30.43' 1/2" IRF CAPPED
"USA INC PROP COR"

LOT 1

S 00°01'18" E          493.63'

N 00°01'18" W          523.63'

EXISTING 10'X 10'
TU TRANSFORMER
EASEMENT

EXISTING 7.5' UTILITY ESMT.

EASEMENT NO. 4
PROPOSED 5' WALL
MAINTENANCE ESMT.
0.058 ACRES
(2,543 SQUARE FEET)

N 89°53'01" W
5.00'

LOT 19   LOT 20   LOT 21   LOT 22   LOT 23   LOT 24   LOT 25   LOT 26   LOT 27

BLOCK D

ROCK CANYON COURT
(50' R.O.W.)

**COMMON AREA EASEMENT NO. 4**
**EXHIBIT "D"**

PROPOSED 5' WALL MAINTENANCE EASEMENT
ACROSS LOTS 20, 21, 22, 23, 24, 25, 26 & 27
BLOCK D
STONE MEADOW ADDITION
situated in the
ISABEL FLORES Survey, Abstract No. 507
City of FORT WORTH, TARRANT County, Texas

**USA Professional Services Group, Inc.**
8700 Stemmons Freeway, Suite 400
Dallas, Texas 75247
(214) 634-3300 fax (214) 634-3338
Page 2 of 2.

STATE OF TEXAS
REGISTERED
TODD B. TURNER
4859
PROFESSIONAL
LAND SURVEYOR

Todd B. Turner, RPLS 4859          Date
98045

11-3-00

NOTE:

Bearing are based on the West line
of Stone Meadow Addition, as
recorded in Cabinet A, Slide 6107 of
the Map Records of Tarrant County,
Texas.



D200280034
LEGACY HOMES
4050 W PARK BLVD 75093
PLANO TX  75093

—W A R N I N G—THIS IS PART OF THE OFFICIAL RECORD——D O  N O T  D E S T R O Y

I N D E X E D —— T A R R A N T  C O U N T Y  T E X A S
S U Z A N N E  H E N D E R S O N —— COUNTY CLERK
O F F I C I A L  R E C E I P T

T O:    LANDAMERICA

RECEIPT NO          REGISTER      RECD BY      PRINTED DATE   TIME
201074300           DR91          CAP          12/18/2000     11:43

            INSTRUMENT  FEECD              INDEXED     TIME
      1     D200280034  WD                 20001218    11:43   CK 4032

      T O T A L :  DOCUMENTS: 01        F E E S:       69.00

      B Y: _____

      ANY PROVISION WHICH RESTRICTS THE SALE RENTAL OR USE
      OF THE DESCRIBED REAL PROPERTY BECAUSE OF COLOR OR RACE
      IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW